**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

EASTERN PORTLAND CEMENT
CORP.,

       Plaintiff,

v.                                                               Case No. 8:08-cv-637-T-24 TBM

F.L. SMIDTH INC.,

       Defendant.
_____/

## ORDER

This cause comes before the Court on two motions: (1) Defendant's Motion for Partial Summary Judgment (Doc. No. 55), which Plaintiff opposes (Doc. No. 68); and (2) Defendant's Motion to Strike Affidavit of Kelli Webb (Doc. No. 75), which Plaintiff opposes (Doc. No. 81).[1]

## I. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted). The moving party bears the initial burden of showing the Court, by

---

[1] With regards to the affidavit of Kelli Webb (Doc. No. 69, Ex. C), the Court has only considered the email chain attached to her affidavit in connection with the summary judgment motion. The email chain shows that FLS and EPC were not communicating effectively with each other–a fact which neither party can dispute. Otherwise, the Court did not consider her affidavit in connection with FLS's motion for summary judgment, and as such, the Court denies FLS's motion to strike her affidavit as moot.

reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See id. (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. See id. (citation omitted).

## II. Background

This case involves a contract entered into by Plaintiff Eastern Portland Cement Corp. ("EPC") and Defendant F.L. Smidth Inc. ("FLS"), wherein FLS agreed to design and manufacture a pneumatic ship unloader for EPC. This unloader was to be used by EPC at its Port Manatee cement import terminal, located at Berth 8. The unloader was purchased as part of EPC's planned expansion of its leased facilities at Port Manatee. The central dispute between the parties is whether they agreed and/or intended that FLS would design an unloader that would work within the existing load-bearing capacity of the dock without requiring modifications to the dock beyond resurfacing. However, the Court notes that EPC does not cite to any portion of the parties' contract in which they explicitly impose such a condition.

On February 14, 2006, FLS presented to EPC and the Manatee County Port Authority ("Port Authority") a drawing of a proposed unloader that FLS could design and manufacture for EPC to be used at Port Manatee. (Doc. No. 69, Ex. D, ¶ 3). The Port Authority construed the drawing as indicating that FLS intended to design the unloader to work within the maximum allowable loads for Berth 8. (Doc. No. 69, Ex. D, ¶ 3).

On March 2, 2006, EPC sent FLS a Limited Notice to Proceed with the design of the unloader, with the understanding that the parties would later execute a more comprehensive,

final contract for the design and manufacturing of the unloader. (Doc. No. 56, Ex. B). However, on March 15, 2006, the Port Authority decided that the unloader needed to travel away from the dock for parking, which was not originally contemplated by the parties. (Doc. No. 69, Ex. A, p.7; Doc. No. 56, Ex. G, ¶3; Doc. No. 56, Ex. A, depo Ex. 7). The Port Authority's decision resulted in the unloader being required to travel over lower load-bearing areas of the dock. On March 24, 2006, FLS signed the Limited Notice to Proceed, and EPC paid FLS an advance of $645,000. (Doc. No. 56, Ex. B).

The original concept for the unloader was based on a 96 wheel design. However, due to the Port Authority's determination that the unloader had to be parked away from the dock, FLS contemplated other designs. On June 5, 2006, an engineering firm, Hartford, provided FLS with a 24 wheel design for the unloader. (69E, depo Ex. 18). The 24 wheel design made it easier to steer and park the unloader. (Doc. No. 69, Ex. E, depo Ex. 29). The 24 wheel design for the unloader was discussed at the monthly project meetings that EPC held in July and August of 2006. (Doc. No. 69, Ex. A, p.10; Doc. No. 56, Ex. G, ¶6; Doc. No. 69, Ex. G, depo p. 153-54; Doc. No. 56, Ex. F, depo p. 213-16).

In July of 2006, the project engineer for EPC's expansion project, Penn Pro Inc., expressed concern regarding the accuracy and sufficiency of the historical information provided by the Port Authority regarding the structural integrity of Berth 8. (Doc. No. 56, Ex. E, ¶ 9). As a result, Penn Pro ordered a geotechnical analysis of the subsurface conditions at Berth 8. (Doc. No. 56, Ex. I, ¶ 2).

On August 11, 2006, FLS delivered to EPC the final, comprehensive contract for the design and manufacturing of the unloader, with a total price exceeding $6.5 million. (Doc. No.

3

56, Ex. C). The contract specified that FLS would supply certain structural engineering services, including designing the equipment gantry, performing the dock load analysis, and designing the wheelset/stabilizer. (Doc. No. 56, Ex. C). Furthermore, under the "Division of Responsibilities" section of the contract, the parties specified that EPC was responsible for all dock modifications. (Doc. No. 56, Ex. C). On September 6, 2006, EPC signed the final contract and paid FLS $1,310,860 due under the contract. (Doc. No. 56, Ex. C).

The parties dispute whether FLS told EPC, prior to entering into the final contract, that there were issues regarding whether the 24 wheel design for the unloader would exceed the load-bearing capacity of the dock, and thus, the design could require modifications to the dock beyond resurfacing. (Doc. No. 69, Ex. G, Ex. 6; Doc. No. 69, Ex. F, Ex. 7). Additionally, EPC points out that the final contract included specifications for the 96 wheel design, and as such, EPC argues that it did not approve the design change from 96 wheels to 24 wheels prior to entering into the final contract. (Doc. No. 56, Ex. C; Doc. No. 69, Ex. H).

The parties do not dispute that on September 19, 2006, after the parties had entered into the final contract, FLS told EPC that it was concerned with the ability of the dock to handle the weight of the unloader and asked whether it should continue with the 24 wheel design or the 96 wheel design. (Doc. No. 69, Ex. A, p.13; Doc. No. 69, Ex. E, depo Ex. 29). EPC responded that the issue needed to be discussed at the next project meeting, which was held on November 29, 2006. (Doc. No. 69, Ex. E, depo Ex. 29; Doc. No. 56, Ex. E, ¶ 7.

At the November 29, 2006 project meeting, there was a discussion regarding the

4

preliminary geotechnical findings that the dock could not support the weight of the unloader.[2] (Doc. No. 56, Ex. E, ¶ 11-12 & Nov. mtg min, p. 2433-2434).  As a result, it was determined at this project meeting that the evaluation and recommendation from the geotechnical analysis would be used to make the necessary structural reinforcements to Berth 8 in order to accommodate the unloader with the 24 wheel design.  (Doc. No. 56, Ex. E, ¶ 11-12 & Nov mtg min, p. 2433-2434; Doc. No. 56, Ex. G, ¶6; Doc. No. 69, Ex. A, p. 13; Doc. No. 56, Ex. I, ¶ 8-9).

The next project meeting was held on December 12, 2006.  At that project meeting, it was determined that EPC would meet with the Port Authority as soon as possible after January 4, 2007 to discuss the recommended dock modifications.  (Doc. No. 56, Ex. E, Dec mtg min, p. 2442-2444).

On December 13, 2006, FLS delivered the final design drawing of the 24 wheel unloader to EPC.  (Doc. No. 46, Ex. G, ¶ 6).  On the same date, EPC responded that it would not take any steps toward approving the final design drawing until EPC reviewed the dock modification proposals in January of 2007.  (Doc. No. 69, Ex. A, p. 11).  On December 15, 2006, FLS gave EPC an invoice for $1,966,290, as set forth under the parties' contract, with payment due in 30 days.  (Doc. No. 56, Ex. G, ¶ 7; Doc. No. 56, Ex. D; Doc. No. 56, Ex. C).  EPC never paid this invoice.

At some point after receiving FLS's final design drawing, but at least by April 7, 2007, EPC learned that the necessary dock modifications based on the geotechnical report and FLS's proposed design were estimated to exceed $1.8 million.  (Doc. No. 69, Ex. I, depo Ex. 11A).  On

---

[2]The final geotechnical report was issued on December 26, 2006, which concluded that the dock, as it currently existed, could not support the weight of the unloader.  (Doc. No. 69, Ex. E, depo Ex. 31; Doc. No. 56, Ex. I, ¶ 8-9).

5

April 7, 2007, EPC wrote a letter to the Port Authority requesting that the Port Authority share in the cost of the dock modifications. (Doc. No. 69, Ex. I, depo Ex. 11A). On April 17, 2007, the Port Authority responded and did not indicate a willingness to share in the cost. (Doc. No. 69, Ex. I, depo Ex. 12). Thereafter, on May 10, 2007, EPC told FLS to suspend its work under the contract. (Doc. No. 56, Ex. G, ¶ 9-10).

On July 12, 2007, EPC's attorney sent a letter to FLS, in which the attorney objected to FLS's demands for payment and outlined FLS's role in the situation. (Doc. No. 80, depo Ex. 13). However, EPC's attorney stated that EPC was committed to completing the expansion project, as long as there was shared responsibility and teamwork. (Doc. No. 80, depo Ex. 13). Additionally, he requested a response from FLS regarding how the parties could work together to jointly minimize the cost and delay. (Doc. No. 80, depo Ex. 13).

By October of 2007, communication between the parties began to break down and their relationship began to sour. (Doc. No. 56, Ex. G, ¶ 11-14). On October 2, 2007, FLS emailed EPC, asking for a meeting. (Doc. No. 69, Ex. C). EPC responded that before it would set a meeting, it wanted a written proposal from FLS for a solution to the unloader/dock problem (i.e., the issue of the unloader design necessitating substantial, costly modifications to the dock). (Doc. No. 69, Ex. C). Thereafter, on November 8, 2007, FLS emailed EPC again asking for a meeting. (Doc. No. 69, Ex. C). Again, EPC responded that before it would set a meeting, it wanted a written proposal from FLS for a solution to the unloader/dock problem. (Doc. No. 69, Ex. C). Likewise, on November 11, 2007, FLS emailed EPC asking for a meeting, and on November 27, 2007, EPC responded that before it would set a meeting, it wanted a written proposal from FLS for a solution to the unloader/dock problem. (Doc. No. 69, Ex. C). On

December 5, 2007, EPC emailed FLS inquiring as to the status of the written proposal for a solution, and on December 7, 2007, FLS wrote a five-page letter to EPC attempting to respond to EPC's request for a written proposal. (Doc. No. 69, Ex. C; Doc. No. 80, Ex. A). However, in its December 7, 2007 letter, FLS stated that it could not provide an effective proposal without the parties having a meeting, because FLS needed to find out exactly what EPC was trying to accomplish and under what specific performance requirements. (Doc. No. 80, Ex. A). EPC did not respond to FLS's December 7, 2007 letter. (Doc. No. 56, Ex. G, ¶ 14).

On January 16, 2008, FLS sent a letter to EPC stating that since its work under the contract had been suspended for eight months and EPC would not schedule a meeting with FLS, FLS was concerned as to whether EPC intended to resume and complete the work under their contract. (Doc. No. 80, Ex. B; Doc. No. 56, Ex. G, ¶ 20). Therefore, FLS requested that EPC provide FLS with: (1) a written assurance by January 25, 2008 that it intended to resume and complete all remaining work under their contract, (2) an unconditional commitment to meet with FLS by the end of the first week in February of 2008, and (3) an unconditional commitment to lift the suspension of FLS's work under the contract by February 29, 2008. (Doc. No. 80, Ex. B). EPC did not timely respond to FLS's January 16, 2008 letter, and as a result, FLS sent a letter to EPC on January 30, 2008 terminating their contract. (Doc. No. 56, Ex. G, ¶ 21-22; Doc. No. 80, Ex. C).

However, on January 31, 2008, EPC's attorney sent a letter to FLS stating the EPC's delay in responding to FLS's January 16, 2008 letter was due to the termination of EPC's two project managers. (Doc. No. 80, depo Ex. 14). Additionally, EPC's attorney requested that FLS postpone the termination of the contract. (Doc. No. 80, depo Ex. 14). It is not clear as to

7

whether FLS responded to this letter, but on March 12, 2008, EPC filed the instant lawsuit against FLS for breach of contract.

On April 30, 2008, EPC amended its complaint and added a claim for rescission. (Doc. No. 4). Thereafter, on May 4, 2009, EPC amended its complaint again. (Doc. No. 42). In its second amended complaint, EPC asserts two claims against FLS–breach of contract and rescission. (Doc. No. 42). In its breach of contract claim, EPC alleges that FLS breached their contract by failing to design the unloader so that it would function within the existing load requirements of Berth 8 and by changing from the 96 wheel design to the 24 wheel design without EPC's approval. In its rescission claim, EPC seeks rescission due to a mistake regarding the ability to design an unloader that would function within the existing load requirements of Berth 8 and/or impossibility of FLS to create an unloader that would function within the existing load requirements of Berth 8. In response, FLS asserted a counterclaim against EPC for breach of contract due to EPC's failure to pay the amounts invoiced and also due to EPC's anticipatory repudiation of the contract (by failing to provide FLS with adequate assurances when requested in January of 2008). (Doc. No. 43).

### III. Motion for Partial Summary Judgment

FLS argues that it is entitled to summary judgment on its breach of contract counterclaim and on EPC's claim for rescission. Specifically, FLS argues: (1) the rescission claim fails because EPC did not timely move to rescind the contract, and in fact, accepted the contract after learning the facts that it alleges it had been mistaken about; and (2) EPC committed a material breach when it failed to respond to FLS's request for adequate assurance in January of 2008. Accordingly, the Court will analyze each claim.

8

**A. Goods Versus Services**

Before this Court can address the merits of FLS's arguments, the Court must first determine whether the Uniform Commercial Code ("UCC") applies to the parties' contract. The UCC only applies to transactions in goods, and "'goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale."[3] Fla. Stat. § 672.102 and § 672.105(1). In this case, the contract is for both goods (i.e., the unloader itself) and services (i.e., the design of the unloader and the dock load analysis), and as such, the answer to the question of whether the UCC applies is not immediately apparent.

In BMC Indus., Inc. v. Barth Indus., Inc., 160 F.3d 1322, 1329-30 (11th Cir. 1998), the court stated that when contracts involve both goods and services, Florida courts apply the predominant factor test to determine whether the contract is predominantly for goods or services. While no single factor is dispositive, courts consider several factors, including: (1) the language of the contract (for example, terms such as "purchase," "buyer," and "seller" indicate that the transaction is more likely one for goods rather than services), (2) the manner in which the transaction was billed (for example, when the contract price does not include the cost of services or the cost of services is less than the cost of the goods, such indicates that the contract is more likely a contract for goods), (3) whether the contract involves movable goods (which indicates that the contract is more likely a contract for goods), and (4) the circumstances surrounding the contract. See id. at 1330-31. "The question whether a contract is predominantly for goods or services is generally one of fact." Id. at 1331; see also Birwelco-Montenay v. Infilco Degremont, Inc., 827 So. 2d 255, 257 (Fla. 3d DCA 2002)(stating that where the parties dispute

---

[3]There are some exceptions from this definition that are not applicable in this case.

9

whether the nature of the contract is one for goods or services, summary judgment on the issue is not appropriate, as the jury must determine the nature of the contract).

A review of the relevant factors reveals that a genuine issue of material fact exists regarding the predominant nature of this contract. As such, this Court cannot determine at this time, as a matter of law, whether the UCC applies.

**B. Rescission**

EPC's rescission claim is based on EPC's assertion that: (1) there was a unilateral or mutual mistake regarding the ability to design an unloader that would function within the existing load requirements of Berth 8, and/or (2) it became impossible for FLS to create an unloader that would function within the existing load requirements of Berth 8. FLS argues that it is entitled to summary judgment on EPC's rescission claim, because EPC did not timely move to rescind the contract, and in fact, EPC accepted the contract after learning the true facts.

Regardless of whether EPC is seeking the equitable remedy of rescission or the equivalent under the UCC[4], EPC needed to give notice of its intent to rescind the contract with reasonable promptness. See Rood Co. v. Board of Public Instruction of Dade County, 102 So. 2d 139, 141 (Fla. 1958); Fla. Stat. § 672.608(2). Furthermore, whether such notice was given with reasonable promptness is generally a question of fact. See Henson v. James M. Barker Co., Inc., 636 So. 2d 887, 889 (Fla. 1st DCA 1994); Ballas v. Spolyar, 548 So. 2d 1168, 1169 (Fla. 2d DCA 1989); Central Florida Antenna Svc., Inc. v. A.M. Crabtree, 503 So. 2d 1351, 1353 (Fla 5th DCA 1987).

---

[4]While the UCC has abandoned the term "rescission," it codified such remedy in the "revocation of acceptance" provision, as set forth in Florida Statute § 672.608. See Pepper v. Kasual Kreations, Inc., 416 So. 2d 864, 865 (Fla. 3d DCA 1982).

In this case, there is a question of fact regarding whether EPC acted with reasonable promptness in giving notice of its intent to rescind the contract. EPC gave formal notice of its intent to rescind when it amended its complaint and added a claim for rescission on April 30, 2008. Whether waiting until April 30, 2008 to give formal notice of its intent to rescind was reasonable depends on when EPC learned of the facts upon which its recision claim is based (i.e., facts supporting its theories of mistake and impossibility). While it appears undisputed that EPC learned that the 24 wheel design for the unloader exceeded the load-bearing capacity of the dock by the November 29, 2006 project meeting, there remains a question of fact regarding whether the actions EPC took immediately thereafter support its argument that it was reasonable to delay formal notice of its intent to rescind the contract until April 30, 2008.

For example, when FLS delivered its final design drawing to EPC on December 13, 2006, EPC responded that it would not approve the drawing until it reviewed the dock modification proposals. Thus, one could construe EPC's affirmative actions at that time as conveying that it was not willing to go forward with the manufacturing of the unloader until EPC determined the extent and cost of the necessary dock modifications due to its mistaken belief that the dock would not require modifications beyond resurfacing. Furthermore, EPC argues that it reviewed the dock modification proposals, sought assistance from the Port Authority, promptly suspended further work under the contract, and then attempted to solicit solutions from FLS–all affirmative actions consistent with its position that it was objecting to being bound by the unloader contract once it learned that it was mistaken as to its belief that the unloader would be able to function without modifying the dock beyond resurfacing it.

The Court acknowledges, however, that it does appear somewhat unreasonable for EPC

11

to wait until April 30, 2008 to give formal notice of its intent to rescind the contract, since (1) EPC knew by November 29, 2006 that the 24 wheel design for the unloader exceeded the load-bearing capacity of the dock; (2) EPC knew by April 17, 2007 that the estimated cost of the dock modifications exceeded $1.8 million and that the Port Authority was not willing to share in the cost; (3) the parties did not appear to be effectively working together towards a resolution of the dock/unloader issue after EPC suspended FLS's work under the contract on May 10, 2007; and (4) FLS sent a letter terminating the contract to EPC on January 30, 2008. However, given the limited evidence before the Court, it is not clear as to what exactly was going on between the parties after the contract was suspended, i.e., how actively EPC was attempting to solicit solutions from FLS and whether the duration of this alleged attempt was reasonable before EPC decided to give formal notice of its intent to rescind. As such, the Court finds that whether the delay was reasonable is a question of fact that precludes summary judgment on the issue of rescission. See Bair v. A.E.G.I.S. Corp., 523 So. 2d 1186, 1189 (Fla. 2d DCA 1988)(finding that a two-year delay in revoking acceptance was reasonable under the facts of the case).

### C. Breach of Contract

Next, FLS argues that it is entitled to summary judgment on its breach of contract counterclaim, because EPC failed to pay the amounts invoiced and also because of EPC's anticipatory repudiation of the contract (by failing to provide FLS with adequate assurances when requested in January of 2008). However, given that the Court has not resolved the issue of rescission, the Court finds that summary judgment on FLS's breach of contract counterclaim is inappropriate.

## IV. Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1) Defendant's Motion for Partial Summary Judgment (Doc. No. 55) is **DENIED**.

(2) Defendant's Request for Oral Argument (Doc. No. 57) is **DENIED**.

(3) Defendant's Motion to Strike Affidavit of Kelli Webb (Doc. No. 75) is **DENIED AS MOOT**.

**DONE AND ORDERED** at Tampa, Florida, this 16th day of September, 2009.

Copies to:
Counsel of Record

SUSAN C. BUCKLEW
United States District Judge