UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EASTERN PORTLAND CEMENT
CORP.,

       Plaintiff,

v.                                                    Case No. 8:08-cv-637-T-24 TBM

F.L. SMIDTH INC.,

       Defendant.
_____/

## ORDER

This cause comes before the Court on Plaintiff's Motion for Partial Summary Judgment. (Doc. No. 101). Defendant opposes the motion. (Doc. No. 114).

### I. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See id. (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. See id. (citation omitted).

**II. Background**

This case involves a contract entered into by Plaintiff Eastern Portland Cement Corp. ("EPC") and Defendant F.L. Smidth Inc. ("FLS"), wherein FLS agreed to design and manufacture a pneumatic ship unloader for EPC. This unloader was to be used by EPC at its Port Manatee cement import terminal, located at Berth 8. The unloader was purchased as part of EPC's planned expansion of its leased facilities at Port Manatee. The central dispute between the parties is whether they agreed and/or intended that FLS would design an unloader that would work within the existing load-bearing capacity of the dock without requiring modifications to the dock beyond resurfacing. However, the Court notes that EPC does not cite to any portion of the parties' contract in which they explicitly impose such an obligation or explicitly recognize that FLS was making such a guarantee.[1]

On February 14, 2006, FLS presented to EPC and the Manatee County Port Authority ("Port Authority") a drawing of a proposed unloader that FLS could design and manufacture for EPC to be used at Port Manatee. (Doc. No. 69, Ex. D, ¶ 3). On March 2, 2006, EPC sent FLS a Limited Notice to Proceed with the design of the unloader, with the understanding that the parties would later execute a more comprehensive, final contract for the design and manufacturing of the unloader. (Doc. No. 56, Ex. B). However, on March 15, 2006, the Port Authority decided that the unloader needed to travel away from the dock for parking, which was not originally contemplated by the parties. (Doc. No. 69, Ex. A, p.7; Doc. No. 56, Ex. G, ¶3;

---

[1]Additionally, the Court notes that in two separate places in the contract, FLS states that there are no other warranties or guarantees, express or implied, including the implied warranty of fitness for a particular purpose. (Doc. No. 56, Ex. C, page 28 of the Performance Warranty & ¶ 19(e) of the Modified Terms and Conditions).

2

Doc. No. 56, Ex. A, depo Ex. 7). The Port Authority's decision resulted in the unloader being required to travel over lower load-bearing areas of the dock. On March 24, 2006, FLS signed the Limited Notice to Proceed, and EPC paid FLS an advance of $645,000. (Doc. No. 56, Ex. B).

In July of 2006, the project engineer for EPC's expansion project, Penn Pro Inc., expressed concern regarding the accuracy and sufficiency of the historical information provided by the Port Authority regarding the structural integrity of Berth 8. (Doc. No. 56, Ex. E, ¶ 9). As a result, EPC requested that Penn Pro issue a change order to investigate the subsurface condition of Berth 8. (Doc. No. 56, Ex. E, ¶ 9; Doc. No 56, Ex. B to Ex. E: Penn Pro Change Order). On July 24, 2006, after the change order was approved, Penn Pro ordered a geotechnical analysis of the subsurface condition of Berth 8. (Doc. No. 56, Ex. I, ¶ 2; Doc. No. 56, Ex. E, ¶ 10; Doc. No. 56, Ex. I, ¶ 2-4; Doc. No. 56, Ex. A to Ex. I: Purchase Order).

On August 11, 2006, FLS delivered to EPC the final, comprehensive contract for the design and manufacturing of the unloader, with a total price exceeding $6.5 million. (Doc. No. 56, Ex. C). The contract specified that FLS would supply certain structural engineering services, including designing the equipment gantry, performing the dock load analysis, and designing the wheelset/stabilizer. (Doc. No. 56, Ex. C, p. 9). Furthermore, under the "Division of Responsibilities" section of the contract, the parties specified that EPC was responsible for "dock modifications." (Doc. No. 56, Ex. C, p.23). The contract also specified that "[u]nless otherwise agreed in writing[,] the design, material and installation of any foundations for Equipment shall be [EPC's] responsibility."[2] (Doc. No. 56, Ex. C, p. 1/4 of Modified Terms and Conditions, ¶

---

[2]There are no allegations that FLS and EPC made any such written agreement to change the responsibility for the foundation.

3

4(c)). Finally, the contract provides that it "alone constitutes an offer and all other offers or counteroffers[,] whether written or oral[,] with respect to the subject matter hereof[,] are hereby rejected or withdrawn, and of no further force or effect." (Doc. No. 56, Ex. C, p. 1/4 of Modified Terms and Conditions, ¶ 2(a)). On September 6, 2006, EPC signed the final contract and paid FLS $1,310,860 due under the contract. (Doc. No. 56, Ex. C).

On September 19, 2006, after the parties had entered into the final contract, FLS told EPC that it was concerned with the ability of the dock to handle the weight of the unloader. (Doc. No. 69, Ex. A, p.13; Doc. No. 69, Ex. E, depo Ex. 29). EPC responded that the issue needed to be discussed at the next project meeting, which was held on November 29, 2006. (Doc. No. 69, Ex. E, depo Ex. 29; Doc. No. 56, Ex. E, ¶ 7). At the November 29, 2006 project meeting, there was a discussion regarding the preliminary geotechnical findings that the dock could not support the weight of the unloader.[3] (Doc. No. 56, Ex. E, ¶ 11-12 & Nov. mtg min, p. 2433-2434). As a result, it was determined at this project meeting that the evaluation and recommendation from the geotechnical analysis would be used to make the necessary structural reinforcements to Berth 8 in order to accommodate the unloader. (Doc. No. 56, Ex. E, ¶ 11-12 & Nov mtg min, p. 2433-2434; Doc. No. 56, Ex. G, ¶6; Doc. No. 69, Ex. A, p. 13; Doc. No. 56, Ex. I, ¶ 8-9).

The next project meeting was held on December 12, 2006. At that project meeting, it was determined that EPC would meet with the Port Authority as soon as possible after January 4, 2007 to discuss the recommended dock modifications. (Doc. No. 56, Ex. E, Dec mtg min, p.

---

[3]The final geotechnical report was issued on December 26, 2006, which concluded that the dock, as it currently existed, could not support the weight of the unloader. (Doc. No. 69, Ex. E, depo Ex. 31; Doc. No. 56, Ex. I, ¶ 8-9).

2442-2444).

On December 13, 2006, FLS delivered the final design drawing of the unloader to EPC. (Doc. No. 46, Ex. G, ¶ 6). On the same date, EPC responded that it would not take any steps toward approving the final design drawing until EPC reviewed the dock modification proposals in January of 2007. (Doc. No. 69, Ex. A, p. 11). On December 15, 2006, FLS gave EPC an invoice for $1,966,290, as set forth under the parties' contract, with payment due in 30 days. (Doc. No. 56, Ex. G, ¶ 7; Doc. No. 56, Ex. D; Doc. No. 56, Ex. C). EPC never paid this invoice.

At some point after receiving FLS' final design drawing, but at least by April 7, 2007, EPC learned that the necessary dock modifications based on the geotechnical report and FLS' proposed design were estimated to exceed $1.8 million. (Doc. No. 69, Ex. I, depo Ex. 11A). EPC asked the Port Authority to share in the cost of the dock modifications, but the Port Authority declined. (Doc. No. 69, Ex. I, depo Ex. 11A & 12). Thereafter, on May 10, 2007, EPC told FLS to suspend its work under the contract. (Doc. No. 56, Ex. G, ¶ 9-10).

In January of 2008, FLS requested written assurance from EPC that it intended to resume and complete the remaining work under the unloader contract. (Doc. No. 80, Ex. B; Doc. No. 56, Ex. G, ¶ 20). EPC did not provide a timely response, and as a result, FLS sent a letter to EPC on January 30, 2008 terminating their contract. (Doc. No. 56, Ex. G, ¶ 21-22; Doc. No. 80, Ex. C).

On March 12, 2008, EPC filed the instant lawsuit against FLS. EPC asserts claims against FLS for breach of contract and rescission. (Doc. No. 42). In its breach of contract claim, EPC alleges that FLS breached their contract by failing to design the unloader so that it would function within the existing load requirements of Berth 8. In its rescission claim, EPC seeks

rescission due to a mistake regarding the ability to design an unloader that would function within the existing load requirements of Berth 8 and/or impossibility of FLS to create an unloader that would function within the existing load requirements of Berth 8. In response, FLS asserted a counterclaim against EPC for breach of contract due to EPC's failure to pay the amounts invoiced and also due to EPC's anticipatory repudiation of the contract (by failing to provide FLS with adequate assurances when requested in January of 2008). (Doc. No. 43).

## III. Motion for Partial Summary Judgment

EPC argues that the unloader contract contains a latent ambiguity regarding the term "dock modifications." Specifically, on page 23, under the "Division of Responsibilities" section of the contract, the parties specified that EPC was responsible for "dock modifications." (Doc. No. 56, Ex. C, p. 23). EPC argues that the term "dock modifications" is ambiguous in light of the circumstances surrounding the parties at the time of contracting, and when those circumstances are considered, the term "dock modifications" has a narrow definition that only encompasses resurfacing the dock.

However, EPC's argument does not stop there. EPC argues that the undisputed parol evidence shows "that FLS' responsibility was to design the unloader to operate on Berth 8 within the structural load limits existing on Berth 8, such that the 'dock modifications' were limited to resurfacing only." (Doc. No. 101, p. 2). Thus, EPC is focusing on the alleged ambiguity of the term "dock modifications" in order to introduce parol evidence purporting to resolve that ambiguity, when in reality, EPC is attempting to use the parol evidence to insert a new term in the contract–that FLS agreed to design the unloader to operate within the existing structural load limits of Berth 8. Stated differently, EPC is attempting to identify a latent ambiguity regarding

6

its own responsibilities under the contract in order to introduce parol evidence to add a new term regarding FLS' design responsibilities under the contract. However, parol evidence is not admissible to add new terms to a contract; it can only be used to explain ambiguous terms. See Friedman v. Va. Metal Prods. Corp., 56 So. 2d 515, 517 (Fla. 1952); Langford v. Paravant, Inc., 912 So. 2d 359, 362 (Fla. 5th DCA 2005).

Accordingly, the Court notes at the outset that even if the term "dock modifications" is latently ambiguous and the Court allows the admission of parol evidence for the purpose of clarifying what that term means, such evidence cannot be used to add a new term to the contract regarding FLS' design responsibilities. As such, to the extent that EPC is attempting to get the Court to rule that based on the parol evidence in this case, FLS was required to design the unloader so that it would operate within the existing structural load limits of Berth 8, EPC's motion is denied.

With regards to the determination of whether the term "dock modifications" is ambiguous, the Court concludes that it does not need to make such a determination. If the Court agreed with EPC that there was a latent ambiguity regarding the meaning of the term, EPC would attempt to submit parol evidence to show that the parties intended the term to have a narrow meaning, limited to resurfacing.[4] However, the meaning of the term is only relevant to the extent that it supports EPC's theory that the parties were mistaken as to the extent of the

---

[4] Parol evidence is admissible to explain or clarify a latent ambiguity. See Syverson v. Jones, 10 So. 3d 1123, 1125 (Fla. 1st DCA 2009); U.S. on behalf of Small Bus. Admin. v. S. Atl. Prod. Credit Ass'n, 606 So. 2d 691, 695 (Fla. 1st DCA 1992). If, on the other hand, the ambiguity is patent, then parol evidence is not admissible, "because it would require, in effect, the rewriting of a contract with respect to a matter the parties obviously had in mind when they drew the agreement." Hunt v. First Nat'l Bank of Tampa, 381 So. 2d 1194, 1196 n.1 (Fla. 2d DCA 1980)(citing Landis v. Mears, 329 So. 2d 323 (Fla. 2d DCA 1976)).

7

changes that needed to be made to the dock in order for the unloader to operate and that they actually only contemplated that resurfacing the dock would be necessary.[5] If, on the other hand, the Court found that the term was not ambiguous and that the term simply meant "changes made to the dock," EPC would still attempt to submit the same evidence to the trier of fact in an attempt to show that the parties were mistaken as to the extent of the changes that needed to be made to the dock in order for the unloader to operate and that they actually only contemplated that resurfacing the dock would be necessary.[6] Thus, since the real issue is whether the parties were mistaken as to the extent of the changes that needed to be made to the dock in order for the unloader to operate, and since EPC will attempt to use the same evidence to show the alleged mistake as it would use to explain the meaning of "dock modifications" if the Court found the term to be latently ambiguous, the Court need not decide whether the term "dock modifications" is ambiguous.[7] As such, the Court denies EPC's motion to the extent that it asks that the Court

---

[5] The Court notes that prior to entering into the final contract with FLS, EPC knew that its project engineer, Penn Pro, had concerns regarding the structural integrity of Berth 8 and had ordered a geotechnical analysis of the subsurface condition. Therefore, in order to show that EPC and FLS were mutually mistaken regarding the extent of the modifications that needed to be made to the dock in order for the unloader to operate, EPC will have to convince the trier of fact that despite EPC and FLS' concerns regarding the structural integrity of the dock, they both believed that only resurfacing would be necessary.

[6] Parol evidence is admissible to establish that a mutual mistake was made. See Sunset Centres Ltd. P'ship v. Star Value Boynton, Inc., 592 So. 2d 366, 367 (Fla. 4th DCA 1992); Colonial Penn Ins. Co. v. Robertson, 591 So. 2d 273, 274 (Fla. 4th DCA 1991); Miley v. Miley, 402 So. 2d 557, 558 (Fla. 2d DCA 1981); Biggin v. RLI Ins. Co., 2006 WL 1232620, at *5 (M.D. Fla. May 5, 2006).

[7] The Court notes, however, that regardless of what the parties meant when they used the term "dock modifications" on page 23 of their contract, the contract specifically stated in paragraph 4(c) of the Modified Terms and Conditions that EPC was responsible for the installation of the foundation for the Equipment. (Doc. No. 56, Ex. C, p. 1/4 of Modified Terms and Conditions, ¶ 4(c)). Clearly, the dock is the foundation on which the unloader will travel.

8

find that the term "dock modifications" is latently ambiguous.

**IV. Conclusion**

Accordingly, it is ORDERED AND ADJUDGED that Plaintiff's Motion for Partial Summary Judgment (Doc. No. 101) is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, this 27th day of October, 2009.

Copies to:
Counsel of Record

SUSAN C. BUCKLEW
United States District Judge